UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                            )
GARY M. JONES, et al.,                      )
                                            )
            Plaintiffs,                     )
                                            )
v.                                          )    Civil Action No. 08-10583-LTS
                                            )
VITO SCOTTI, et al.,                        )
                                            )
            Defendants.                     )
                                            )
```

MEMORANDUM AND ORDER
ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

September 16, 2011

SOROKIN, M.J.

Currently pending are the Motions for Summary Judgment of Defendants Frank John, Craig Mace and Vito Scotti (Docket # 65) and of Defendants Claims Investigation Services, Inc. and Coleman Wholean (Docket # 48). For the following reasons, the motions are ALLOWED.

I.  FACTUAL AND PROCEDURAL BACKGROUND

At all relevant times, Plaintiff Gary Jones was a Captain with the Police Department of Seekonk, Massachusetts, and Plaintiff Steven Howitt was a Selectman for the Town of Seekonk. Docket # 72 at ¶¶ 1,3. Jones and Howitt brought suit against four Seekonk police officers – Vito Scotti, Frank John, Craig Mace and Wayne Mackiewicz. Docket # 1. On April 26, 2010, the Court dismissed the claims directed against Mackiewicz. Docket # 41. The Plaintiffs have also

1

sued a private investigator, Coleman Wholean, and his business, Claims Investigation Services, Inc. Docket # 1.

Jones and Howitt's claims arise out of two encounters between Howitt and Wholean, the "running" of Wholean's license plate by Jones on Howitt's behalf, Wholean's report to the Seekonk Police Department of his encounters with Howitt and the resulting written warning placed in Jones's employment file regarding his conduct.[1] Each of the Defendants has moved pursuant to Fed. R. Civ. P. 56 for summary judgment, asserting that there are no material facts in dispute and that they are entitled to judgment as a matter of law.

II. DISCUSSION

Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir.1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Moreover, the Court is "obliged to view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir.1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported

---

[1] Further facts will be recited infra, in the light most favorable to the non-moving party, as is necessary to consideration of the motions.

speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir.2009).

**The Defendant Police Officers' Motion for Summary Judgment**

Jones and/or Howitt have asserted the following eight claims against all three defendant police officers (John, Mace and Scotti) excepted as noted: (1) Count Three, for Malicious Prosecution; (2) Count Four, for Abuse of Process (3) Count V, Violation of the First Amendment (Jones versus Scotti only); (4) Count Six, for Violation of Privacy and Illegal Seizure, under Massachusetts law; (5) Count Seven, for Violation of Privacy and Illegal Seizure, under federal law; (6) Count Eight, Violation of their rights to Equal Protection under the Massachusetts Declaration of Rights; (7) Count Nine, Violation of their rights to Equal Protection under the Fourteenth Amendment to the U.S. Constitution; and (8) Count Ten, Conspiracy to Violate Civil Rights.

The Defendant officers seek summary judgment on all of these claims. Docket # 65. Jones and Howitt's joint opposition to their motion, however, addresses only Count Three (the malicious prosecution claim) and Count Five (the First Amendment claim); it fails to address the other claims. Docket # 71. Accordingly, the Court finds that Jones and Howitt have abandoned all of the remaining claims against the Defendant officers and for their failure to prosecute (by failing to address any of the summary judgment issues as to these claims), judgment shall enter for the Defendants John, Mace and Scotti and against the Plaintiffs on Count Four and Counts Six through Ten of the Complaint.

<u>The Malicious Prosecution Claim (against Defendants John, Mace and Scotti)</u>

Jones brings a malicious prosecution claim arising out of internal police disciplinary proceedings. On or about March 28, 2005, Howitt saw Wholean sitting in Wholean's car in the

3

vicinity of Howitt's business as well as of Howitt's mother's home. Docket # 73 at ¶ 1. Howitt approached Wholean's car and the two had a discussion. Docket # 73 at ¶ 2.

Afterward, Howitt called Jones, asked him to run the plate on Wholean's car and requested that Jones provide him with the results. Id. at ¶ 3. Jones did so on April 4, 2005. Id. at ¶ 5. On April 7, 2005, Howitt again saw Wholean in his car on the same street. Id. at ¶ 6; Docket # 72 at ¶ 7. Howitt again approached Wholean and the two men had a second discussion. Docket # 73 at ¶ 6; Docket # 72 at ¶ 7.

On April 7, 2005, Wholean called the Seekonk police department and spoke to Sergeant David Dyson, telling him that he was concerned that his plate had been run because during the second encounter Howitt knew his name, home address and other personal information, and stated that he was nervous, apprehensive and concerned for his own safety and for that of his wife. Docket #s 65-3, 65-4.[2] On April 8, 2005, Wholean appeared at the Seekonk police station and made a written statement to the same effect, describing the two encounters with Howitt in greater detail. Id.; Docket # 72 at ¶ 11.

By all accounts, Wholean's report led to then-Chief Scotti commencing an internal affairs investigation of Jones which included investigation by Defendant Mace. Docket # 72 at ¶ 15; Docket # 73 at ¶ 10. Mace was a Seekonk Police Lieutenant (and thus Jones was his superior officer) who was assigned to handle internal affairs investigations. Id. The relationship between Scotti and Jones suffered from pre-existing difficulties arising from, inter alia, Scotti's

---

[2] Dyson's memorandum of Wholean's phone call does not refer to Wholean's concerns for his safety, although Wholean characterized the call in that fashion within his written statement the next day ("I called the station . . . We were concerned how this person had our personal information"). Docket # 65-4 at 6.

opposition to Jones' promotion to Captain by the Board of Selectmen. Docket # 71-8; Docket # 73 at ¶¶ 11, 27-29. The relationship between Scotti and Howitt was also strained. Docket # 73 at ¶ 11, 26. Howitt testified that he spoke to Scotti only when absolutely necessary. Docket # 65-2 at 14.

The internal affairs investigation encompassed (at least) the running of the license plate by Jones and an allegation (not made by Wholean) that Jones had made an attempt to access Howitt's CORI information for Howitt. Docket # 72 at ¶¶ 31-32. At the conclusion of the investigation, Scotti issued a report to the Board of Selectmen recommending that the Board suspend Jones without pay for fifteen days and demote him. Id. at ¶ 33.

No party has provided a copy of Scotti's report to the Court. The decision of the Arbitrator (see, infra), however, includes excerpts from a letter from Jones to Scotti indicating that in Scotti's view there was substantial evidence to charge Jones with the following: (1) violations of numerous departmental rules (delineated in a portion of the document not part of the record); (2) being untruthful and evasive in the course of the investigation; (3) failing to make a report or log entry concerning Howitt's call concerning a suspicious vehicle; (4) improperly directing a subordinate to provide him with a copy of Howitt's CORI information in response to Howitt's request and failing to advise the Firearms Licensing Officer of Howitt's request; (5) extending undue favor and privilege to Howitt in the performance of his official duties, both by the dissemination of the registration information and by directing a subordinate to provide him with Howitt's CORI information; and (6) misuse of public computer resources for a private purpose. See Docket # 71-15 at 3 to Docket # 71-16 at 6.

Shortly thereafter, for reasons not apparent in the record, Scotti left the Seekonk Police

5

Department and Wayne Mackiewicz became Acting Chief. Id. at ¶¶ 34-35, 51. Mackiewicz "reopened" the investigation to conduct interviews of Howitt and Scotti, after which he issued his own report. Id. at ¶¶ 52-54. The record does not contain a copy of this report. Mackiewicz recommended that Jones receive a fifteen-day suspension without pay. Id. at ¶ 55. He did not recommend that Jones be demoted. Id.

The Board of Selectman held a hearing on December 13, 2005. Id. at ¶ 56. Mackiewicz reduced his recommended suspension from fifteen to ten days, and the Board adopted that recommendation. Id. at ¶¶ 57-58. The Board's written determination has not been provided to the Court. Again, however, the Arbitrator's decision contains a short excerpt, which reveals that the Board sustained two of the four charges of untruthfulness against Jones (including a finding that he falsely claimed to have personally run Howitt's plate, and that he failed to reveal to Scotti the extent of his involvement in researching Howitt's CORI information). Docket # 71-16 at 6. The Board also found that Jones violated rules and regulations pertaining to Attention to Duty, Conduct Unbecoming an Officer and False Information on Records, although the excerpt in the record does not reveal the specific conduct which it found supported those charges. Docket # 71-17 at 1.

Jones claimed his right to arbitration as established by the governing collective bargaining agreement. Docket # 73 at ¶ 58. The discipline was not stayed pending the arbitration process. Id. at ¶ 59. Ultimately, the arbitrator rejected the suspension as not supported by just cause because "[t]he totality of the evidence does not show that Captain Jones was dishonest or untruthful or attempted to cover up his conduct during a departmental investigation." Id. at ¶ 61; Docket # 71-13 at 1. The arbitrator did find that Jones "engaged in a

6

lack of judgment with respect to making no record or making any report [sic] of a suspicious car that came from a call from Mr. Howitt." Docket # 71-13 at 1. He therefore directed the placement of a written warning in Jones' employment file "which can only refer to his failure to be more diligent with respect to his response to Mr. Howitt's call of the suspicious vehicle." Id. at ¶ 61.

In order to prevail on the claim for malicious prosecution under Massachusetts law, Jones must prove that the defendants (1) instituted a prior civil or criminal proceeding (2) without probable cause and with improper purpose; and (3) that the prior proceeding terminated in favor of Jones. Billings v. Commerce Ins. Co., 458 Mass. 194, 196-97 (2010). This claim fails for several reasons.

First, neither Defendant John nor Defendant Mace initiated a proceeding. Participation in the investigation is not a tort, nor does Jones so argue. That Mace and John "voiced no reservations or disagreement" with Scotti's recommendation cannot support liability.

Second, the internal departmental discipline proceedings do not constitute a legal proceeding giving rise to a claim for malicious prosecution. Jones cites no case that stands for the proposition that the internal disciplinary processes of an employer (even a government employer) may give rise to a claim for malicious prosecution. While a purely judicial proceeding is not required, a legal proceeding is required. All of the cases Jones cites concern a materially different circumstance – a claim to a licensing or other regulatory agency resulting in proceedings pursuant to that agency's lawfully-vested authority to adjudicate matters within the agency's jurisdiction (as opposed to an employment disciplinary process). See, e.g., Docket # 71 at 9-10 (citing Sklar v. Beth Israel Deaconess Medical Center, 59 Mass.App.Ct. 550 (2003)

7

(plaintiff occupational therapist's hospital supervisor filed with licensing authorities complaints alleging violations by the plaintiff of professional standards)); American Credit Card Telephone Co. v. National Pay Telephone Corp., 504 So.2d 486 (Fla.App.Ct.1987) ("an agency proceeding may at some point become sufficiently quasi-judicial to support a claim for malicious prosecution" but not in instant case, where defendant company had filed a petition for a formal administrative hearing before a public service commission to contest the proposed authorization of a rival company to provide pay telephone service); Kauffman v. A. H. Robins Co., 448 S.W.2d 400 (Tenn.1969) (defendant made a formal complaint with the Board of Pharmacy that was sufficiently quasi-judicial to constitute civil proceeding for purposes of malicious prosecution).

The Sklar case upon which Jones relies is fatal to his claim. In Sklar, the Appeals Court found that the defendant's referral to the state licensing board might support a malicious prosecution claim, yet nowhere in the decision does the Court even suggest that the internal disciplinary process at the defendant hospital (which had preceded the referral to the licensing board) could have supported such a claim.

Additionally, in light of Sklar's ruling that the subsequent reviews and recommendations in the course of an internal disciplinary process can preclude a finding of improper motive, there is a serious question whether Mackiewicz's and the Board's separate and later actions preclude any finding of improper motive by Scotti. See, Sklar, 59 Mass.App.Ct. at 556 n. 9.

Moreover, even if the disciplinary process constituted a legal proceeding, it did not terminate in Jones's favor. A favorable termination does not mean a termination better than the worst outcome (e.g., a written warning instead of ten-day suspension without pay) -- it means an

adjudication in favor of Jones.³ The judgment of the arbitrator resulted in a formal written warning being placed into Jones' file. That is not an adjudication in his favor.

### The First Amendment Claim (Jones Against Scotti)

In Count Five, Jones alleges that Scotti violated his First Amendment rights to free speech and association by ordering that Jones not speak to Howitt or others about the investigation during its pendency. This claim also fails.

Jones alleges that "[d]uring the investigation Defendant Scotti ordered Captain Jones to refrain from speaking about the investigation with Mr. Howitt, other police officers and former members of the Board of Selectmen." Docket # 71 at 13; See also, Docket # 73 at ¶ 36, Docket # 71-8 at ¶ 16.

---

³ The Restatement (Second) of Torts's comment on the favorable termination requirement in malicious prosecution claims provides that civil proceedings are terminated in favor of the person against whom they are brought by "(1) the favorable adjudication of the claim by a competent tribunal or (2) the withdrawal of the proceedings by the person bringing them, or (3) the dismissal of the proceedings because of his failure to prosecute them. A favorable adjudication may by a judgment rendered by a court after trial, or upon demurrer or its equivalent." Restatement (Second) of Torts, § 674, comment on Clause (b). See also 30 A.L.R.4th 572, 'Nature of Termination of Civil Action Required to Satisfy Element of Favorable Termination to Support Action for Malicious Prosecution,' § 7 ("a termination, in order to be considered favorable, must be such as will support the inference that the underlying civil proceedings were instituted without probable cause or foundation"). The imposition of discipline against Jones by the arbitrator (albeit lesser discipline) does not support the inference that the police department disciplinary proceedings were instituted without probable cause or foundation. Similarly, when the prior proceeding giving rise to a malicious prosecution was a criminal proceeding, such proceedings are "terminated in favor of the accused," "only when their final disposition is such as to indicate the innocence of the accused." Restatement (Second) of Torts § 660, Comment on Clause (a). See, e.g., Poku v. Himelmann, 2011 WL 3907128 (3d Cir.2011) (where the plaintiff was acquitted of one charge but convicted of another, the plaintiff's Section 1983 claim for malicious prosecution fails because he cannot establish that the proceeding ended in his favor "[w]hen the circumstances—both the offenses as stated in the statute and the underlying facts of the case—indicate that the judgment as a whole does not reflect the plaintiff's innocence").

9

Nothing about this Order was unlawful. The government acting as an employer "has far broader powers" than does the government acting as sovereign. Engquist v. Oregon Dept. of Agr., 553 U.S. 591, 598 (2008) (citing Waters v. Churchill, 511 U.S. 661, 671 (1994)). "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." Waters, 511 U.S. at 675. Given the "common-sense realization that government offices could not function if every employment decision became a constitutional matter," "constitutional review of government employment decisions must rest on different principles than review of . . . restraints imposed by the government as sovereign." Engquist, 553 U.S. at 599 (quoting Connick v. Myers, 461 U.S. 138, 150–151 (1983); Waters 511 U.S. at 674).

In analyzing a claim that a public employee was deprived of First Amendment rights by his employer, Courts are to seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 599-600 (quoting Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U.S. 563, 568 (1968)). Although government employees do not lose their constitutional rights when they accept their positions, those rights must be balanced against the realities of the employment context. Id. at 600. In striking the appropriate balance, courts are to consider whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer. Id. "[A]bsent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly

in reaction to the employee's behavior." Id. (quoting Connick, 461 U.S. at 147).

The order of which Jones complains only precluded Jones from discussing the subject matter of the investigation. It was narrowly tailored to serve the legitimate interests of his employer in preserving the integrity of its investigation. Jones also contends that the order interfered with his ability to mount a defense to the disciplinary charge against him. Perhaps Jones would have a claim if he presented evidence (a) that Scotti had rejected a reasonable request for contact regarding the investigation for the purpose of preparing a defense, or (b) that the order applied to counsel (but by its terms it did not) or (c) that the barred communications would have helped his case in some way. Jones, however, offers no such evidence.

Immunity Defenses

In light of the Court's resolution of the merits of the remaining claims against the defendant officers, analysis of the assertions of absolute and qualified immunity is unnecessary.

**Wholean and CIS's Motion for Summary Judgment**

In the Complaint, the Plaintiffs brought three claims against the movants, Wholean and CIS: (1) Count One, for False Reports to Police Officers (Howitt and Jones versus both Defendants); (2) Count Two, for Defamation (Howitt versus both defendants); and (3) Count Ten, for Civil Rights Conspiracy (Howitt and Jones versus both Defendants). Docket # 1. Subsequent to the filing of Wholean and CIS's motion for summary judgment, the Parties stipulated to the dismissal of Counts One and Ten of the Complaint. Docket # 61. Thus, only the claim for defamation remains.

Additional Factual Background

Analysis of the Motion for Summary Judgment of Defendants Claims Investigation

11

Services, Inc. and Coleman Wholean (Docket # 48) requires the recitation of additional facts. The Parties do not dispute that Wholean provided the following information to the Seekonk Police Department (although they do dispute the accuracy and veracity of the information).[4]

On April 7, 2005, at 7:45 p.m., Sgt. David Dyson of the Seekonk Police Department received a call from Wholean. Docket # 65-3. According to Dyson, Wholean reported two encounters with Howitt --the first on April 4, 2007 and the second on April 6, 2007. Id. Both encounters occurred in the vicinity of Modern Tractor, Howitt's business (and the site to which Wholean had followed someone whom he was investigating for worker's compensation fraud). Id. Wholean told Dyson that in the first encounter, Howitt asked him what he was doing there. Id. Wholean told Dyson that in the second encounter, Howitt confronted Wholean, asked him what he was doing and stated to him, "'if I find out this concerns me, my family or my employees I know people in Rhode Island and I will have them pay you a visit," after which Howitt said this was not a threat. Id. Wholean reported that Howitt also said that he had had Wholean's plate checked the other day and that Howitt knew where Wholean lived in North Kingstown and that he knew that his wife owned Claims Investigation Services, Inc. Id. Dyson arranged for Wholean to come to the Seekonk police station the next day. Id.

On April 8, 2005, Wholean appeared at the Seekonk Police Station. Docket # 65-4. Defendants John and Scotti interviewed him. Id. The officers prepared a report of the interview,

---

[4] Howitt seems to argue in his brief that Wholean defamed Howitt both by making to the police the statements described in the text and by making these same statements to his wife (in what the record presents as a private, face-to-face, confidential conversation between Wholean and his wife). See Docket #60 at ¶ 16. If Howitt intends to press the argument that he has been defamed by such a private confidential conversation between a married couple than he must present a developed argument in support of such a theory. He has not done so. Accordingly, it is not considered.

including a transcript, which Wholean and both officers signed. Id. Wholean provided a similar, but more-detailed, account of his two encounters with Howitt, although the interview report dates the second encounter to April 7th rather than April 6th. Docket #65-4 at 3. Regarding the first encounter, Wholean said that Howitt was driving behind Wholean and appeared to be speaking on his cell phone in an "excited manner" which he also described as "talking/yelling into the cell phone in an angry manner." Id. at 2. Wholean pulled over to allow Howitt to pass, and as Howitt went by, Howitt paused. Id. The two men rolled down their windows and spoke. Id. Howitt asked what Wholean was doing. Id. Wholean said he was looking for a bank to which Howitt responded:

> There's no bank in a residential neighborhood. Your [sic] full of bull there's no bank around here and there have been break in's [sic] in the area. I have your plate and I'm going to call the police and you should know I'm a Selectman in town.

Id.

Howitt then drove off. Id. Nothing in Wholean's report to the police suggested that whatever angry or excited conversation Howitt was having prior to speaking with Wholean either concerned Wholean or was in any way improper.

Regarding the second encounter, Wholean said that he had pulled into a nearby truck terminal parking lot to get some surveillance equipment ready. Id. at 3-4. Howitt pulled up in front of Wholean's car "blocking [Wholean] in." Id. at 4. "[I]n a very aggressive manner [Howitt] walked up to [Wholean's] car and started to rap on [the] drivers [sic] window with his knuckles." Id. The police report states that the following dialogue ensued:

> **Howitt**: (angry tone) What are you doing here and why are you watching me?
>
> **Wholean**: It doesn't concern you.

13

>    **Howitt**: I know who you are, you must be Coleman. Your car is registered to Claims Service.
>
>    **Wholean**: Yes I am and I'm working in the area.
>
>    **Howitt**. So why are you watching me? Why does it concern me?
>
>    **Wholean**: It doesn't unless your [sic] cheating on your wife. (trying to lighten the mood)
>
>    **Howitt**: I think your [sic] lying. If I find out your [sic] watching me or my family or any of my employee's [sic] you'll be in trouble. I know people in R.I. who can pay you a visit. I know where you live in Saunderstown so you better not be lying to me, not that I'm threatening you.
>
>    **Wholean**: That sure sounded like a threat to me.
>
>    **Howitt**: You'd better not be lying. Why is Linda (my wife) the president of the company, so you can get federal bids?
>
>    **Wholean**: Yea basically. I'm just a business man trying to make a living.
>
>    **Wholean**: (I was thinking at this time this person was crazy. For him to obtain all my personal business and wife's information and retain it.)
>
>    **Howitt**: Me to [sic]. (Then Howitt walked away).
>
>    <u>Id.</u> at 4.

Other records show that Wholean's plate was run by the Seekonk Police Department on April 4, 2007. Docket #65-3.

Howitt does not dispute that Wholean <u>told</u> the foregoing to the Seekonk Police. He disputes, however, the accuracy and veracity of some of the statements which Wholean made. Specifically, he disputes:

(1) Wholean's assertion that the first (or any) encounter occurred on April 4th (<u>See</u> Docket # 71-2 at ¶ 2) when Howitt says the first encounter occurred on March 28th. <u>See</u> Docket #48-1 at 38; Docket # 58-2 at ¶ 2;

14

(2) Wholean's assertion that Howitt said that he "knew people in Rhode Island" who could "pay Wholean a visit" (See Docket # 60 at ¶ 17). Howitt instead asserts that he said, "I know a lot of people in Rhode Island and I can get your license – I'll go after your license." See Docket #48-1 at 98-99; and

(3) Wholean's assertion that during the second encounter, he "block[ed] in" Wholean's vehicle, "rapped" on Wholean's window, acted "aggressively" or exhibited "anger" toward Wholean. Docket # 48-1 at 75, 106-07.[5]

In addition, Howitt contends that upon telling Wholean on April 7th that Howitt might "go after his license," Wholean began "screaming" at Howitt. Docket # 48-1 at 77.

Discussion

To withstand a motion for summary judgment for defamation, Howitt must show that: (a) the defendants made a statement, concerning him, to a third party; (b) the statement could damage Howitt's reputation in the community; (c) the defendants were at fault in making the statement; and (d) the statement either caused Howitt economic loss (traditionally referred to as "special damages" or "special harm"), or is actionable without proof of economic loss. Ravnikar v. Bogojavlensky, 438 Mass. 627, 629-30 (2003). The level of fault required varies between negligence (for statements concerning private persons) and actual malice (for statements concerning public officials and public figures). Id. (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 347 (1974); Jones v. Taibbi, 400 Mass. 786, 797 (1987)).

---

[5] Howitt also contends that "Wholean's account of the events of April 4, 2005, is completely false as it relates to his alleged contact with Howitt." Docket # 60. The Court simply rejects this assertion as both unsupported and immaterial. Plainly, the parties dispute the date of the first encounter, but the material particulars of that encounter, other than the date (if that is material) are not genuinely disputed.

Howitt identifies several statements by Wholean that he claims are defamatory: (1) the statement that Howitt told Wholean that he "[knew] people in RI who could pay you a visit," in combination with statements that he knew where Wholean lived, which Howitt asserts were an insinuation of criminal conduct (i.e., that Howitt implied that he might send a criminal or thug to visit Wholean at his home to assault or intimidate him) (See Docket # 58 at 8-10; Docket # 60 at ¶ 17);[6] (2) that Howitt did not "block in" Wholean's vehicle, rap on his window, or otherwise act aggressively or exhibit anger (Docket # 60 at ¶ 19, 22); and (3) that Wholean did not encounter Howitt on April 4, 2005, but actually on March 28, 2005 (Id. at ¶¶ 20, 21).

All but one of these statements cannot, as a matter of law, support a claim for defamation. "Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn, or ridicule, or tend to impair his standing in the community." Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991) (quoting Poland v. Post Publishing Co., 330 Mass. 701, 704 (1953)). Misreporting the date of the first encounter as April 4, 2005, instead of March 28, 2005, in no way holds Howitt up to contempt, hatred, scorn or ridicule.[7] To suggest otherwise borders on the frivolous. For this same reason, all but one of the other statements also are insufficient as the

---

[6] The Court notes that the assertion in Howitt's Rule 56.1 Statement that he "did not tell Wholean that if Wholean lied to him again (or if Howitt found out that Wholean was investigating Howitt or Howitt's wife), he knew people in Rhode Island and would have Wholean's license as an investigator 'pulled'"(emphasis added) (See Docket # 60 at ¶ 18), appears to be a typographical error, when considered in combination with counsel's argument that this is precisely what Howitt said (Docket # 58 at 5) and Howitt's own deposition testimony that this is what he said. (Docket # 65-2 at 20). In any event, the Rule 56.1 statement would be insufficient to create a genuine dispute of material fact in light of Howitt's sworn testimony.

[7] Whether or not the alleged misreporting (whether intentional or unintentional) bears on the determination of Wholean's knowledge of the alleged falsity of another statement or his intent in making another statement presents a separate and different question not resolved by concluding that the statement in the text is not defamatory, in this case, as a matter of law.

16

basis of a claim for defamation.

Wholean's report to the police that Howitt threatened him with a visit at home in Rhode Island could, potentially, support a claim for defamation. The defamation claim fails, however, for a separate reason.

Allegedly defamatory statements made to the police when a criminal investigation is underway, and when a prosecution is contemplated or proposed, are absolutely privileged. See, Correllas v. Viveiros, 410 Mass. 314, 321-23 (1991). Under the Restatement (Second) of Torts, cited favorably by the Supreme Judicial Court, the privilege encompasses statements "in communications preliminary to a proposed judicial proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates." Id. at 322 n. 5 (quoting Restatement (Second) of Torts § 587). Moreover, comment e to § 598 of the Restatement, also quoted by the Supreme Judicial Court, provides that "[f]ormal or informal complaints to a prosecuting attorney or other law enforcement officer concerning violations of the criminal law are absolutely privileged under the rule stated in § 587." Id. (quoting Restatement (Second) of Torts § 588, comment e).

Wholean's statements are absolutely privileged and thus cannot support a defamation claim. Plainly, they were at least an informal (if not a formal) complaint to a law enforcement officer about violations of the criminal law – i.e., an alleged threat by Howitt to cause harm to Wholean. While the Supreme Judicial Court did not unequivocally adopt comment e as the governing law in Massachusetts, the Court's favorable treatment of the comment and the reasoning of the Correllas decision support application of the principle in this case.

The Correllas Court distinguished cases finding only a conditional privilege in statements

17

to police:

> The key to understanding these cases lies in the fact that, when the defendants made the allegedly defamatory statement, no criminal action or judicial proceeding was then being contemplated or proposed. As a consequence, the defendants could not reasonably argue that they were entitled to the protection of an absolute privilege.

Id. at 323.

That description does not encompass Wholean's statements to the police. Wholean made a formal, signed statement to the police alleging that he had been threatened. His complaint was in the nature of proposing or initiating a prosecutorial or judicial proceeding which, in a civil context, the Correllas court held receives the protection of the absolute privilege. Id. at 321 (citing Sriberg v. Raymond, 370 Mass. 105, 108 (1976)). "By implicating the plaintiff, the defendant knew that [he] would have to repeat [his] accusations at the plaintiff's trial, and do so under oath, subjecting herself to the possible perjury charges for any false testimony. Affording the defendant an absolute privilege in these circumstances is justified because the final judgment in the criminal prosecution would necessarily be based upon the defendant's testimony." Id. at 324. The Correllas court noted the "right of society to secure the testimony of a witness in proposed and in actual judicial proceedings without the party or witness laboring under the threat of a civil law suit." Id. at 323. Even if no prosecution ensued, laws other than private defamation suits enforce the truthfulness of reports to the police such as the one made by Wholean. For example, M.G.L. c. 269, § 13A, prohibits any person from "intentionally and knowingly" making a false report of a crime to police officers on pain of fine or imprisonment.

In addition, Howitt's own actions started a process that defeats the defamation claim. At the time Wholean made his complaint to the police, a police investigation was already under

18

way. The undisputed facts establish that Howitt initiated an ongoing criminal investigation into the events that transpired in the first encounter and any subsequent reoccurrences. He called the police and requested that Captain Jones run the plate and investigate Wholean. Docket # 65-2 at 14. Captain Jones undertook an investigation – he drove by the vicinity of the encounter to look for Wholean and he ran the plate. Docket # 71-13 at 7. He reported the results to Howitt and instructed Howitt to contact him if Wholean returned (Id.), although the record indicates that Howitt disregarded Jones' instruction instead electing to take matters into his own hands by initiating a second discussion with Wholean. Thus, Wholean's statements to the police did not initiate a criminal investigation, but rather were made in the course of an existing investigation that was already underway, with prosecution a possibility. That Wholean spoke with different officers is irrelevant. They were part of the same police department, examining the same ongoing course of conduct and, indeed shortly after the first phone call they were aware of at least some of the department's preexisting involvement.

For all of the foregoing reasons, Wholean's statements to the police were absolutely privileged and thus cannot support a claim for defamation.[8]

---

[8] I also note that there is insufficient evidence to establish that the statements were made with actual malice or knowledge of their falsity. In order to support the claim, Howitt requires evidence that Wholean made his statement knowing it to be false or with actual malice. The record before the Court cannot support this conclusion. The statement Wholean reported is substantially similar to the statement which Howitt concedes that he made. In both versions, Howitt said that: he had friends in Rhode Island; that he knew where Wholean lived; and that, if Wholean were lying, Howitt would make trouble for Wholean. See Docket # 65-2 at 20. In Howitt's version, he explained that the "trouble" was revocation of Wholean's private detective license, while in Wholean's version Howitt provided no further specification of the trouble. Howitt contends, correctly, that the Court must accept, on summary judgment, his version of the statement. He thus argues that that renders Wholean's statement necessarily false, that Wholean was angry at the threat to his license (as established by Howitt's report of Wholean screaming in response) and that these facts combined with the other disputed facts establish that Wholean

19

III.     CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment of Defendants Frank John, Craig Mace and Vito Scotti (Docket # 65) is ALLOWED.  The Motion for Summary Judgment of Defendants Claims Investigation Services, Inc. and Coleman Wholean (Docket # 48) is likewise ALLOWED.

           /s / Leo T. Sorokin
           Leo T. Sorokin
           United States Magistrate Judge

---

made a knowingly false statement.  The Court disagrees.  Howitt has presented no evidence whatsoever that Wholean committed any wrong or did anything that would even remotely affect Wholean's detective license.  In that circumstance, that Wholean reported a different threatening, (but nevertheless similar) statement to the police, cannot support the conclusion that Wholean knew his version of the event was false or that Wholean made his report with actual malice toward Howitt.